Whitaker, Judge,
delivered the opinion of the court:
Plaintiff H. A. Hamlin is the trustee charged with the liquidation of the corporate affairs of the Willamette Iron and Steel Corporation. (Hereinafter plaintiff will be referred to as Willamette.)
On December 16,1940 defendant notified Willamette that it had been awarded a cost-plus-a-fixed-fee contract for the construction of two mine layers, subject to the execution of a performance bond in the sum of $1,000,000 and a payment bond in the sum of $2,500,000.
Since Willamette was unable to secure these bonds, it entered into a joint venture agreement with Guy F. Atkinson Company (hereinafter called Atkinson), on December 28, 1940, under the terms of which Atkinson and Willamette each agreed to deposit the sum of $600,000 in a trust fund, to secure the sureties on the required performance and payment bonds. Under the agreement Atkinson was given the right “to nominate a person to be employed by the joint venture who is to devote his full time in an executive managerial capacity to cooperate in supervising the work comprising the joint venture.” Such a person was *27 nominated and actively participated in carrying ont the joint venture. Atkinson was entitled to 35 percent of the profits.
Under the laws of the State of Oregon “every mercantile, manufacturing and business corporation doing or authorized to do business within this State shall annually pay to the State * * * for the privilege of carrying on or doing of business by it within this State, an excise tax according to or measured by its net income * * Under this Act Atkinson paid State excise taxes for the years 1941 to 1944 totaling $42,178.96, and for the year 1945, $10,653.99, or a total of $52,832.95, on account of its profits from the joint venture.
Defendant refused to reimburse plaintiff for these taxes on the theory that Atkinson was not a party to the contract and, therefore, it was said, plaintiff could not recover costs incurred by Atkinson incident to the carrying out of the contract. This presents the issue in the case.
Defendant has reimbursed plaintiff for such taxes paid by it; it has refused to pay the taxes incurred by Atkinson only because Atkinson was not a party to the contract. However, defendant was fully informed by plaintiff that the contract was to be performed under the joint venture agreement between it and Atkinson, and, therefore, that Willamette was executing the contract on behalf of the joint venture. On January 6,1941, both Atkinson and Willamette spent the entire day with the contracting officer discussing plans for the joint venture, and the contracting officer consented to this arrangement for carrying out the contract.
Under the terms of the joint venture the contract was to be signed by Willamette only; but the contracting officer was fully advised of the terms of the joint venture and of the fact that the contract was to be performed by Willamette and Atkinson as coadventurers. On the day the contract between defendant and Willamette was executed, plaintiff formally wrote defendant transmitting the contract, together with' the surety bonds, and also a copy of the joint venture agreement.
Plaintiff’s letter of that date reads as follows:
Ht # % H* *
We also hand you herewith a copy of a joint venture agreement which we have made under date December *28 28, 1940, with, the Guy F. Atkinson Company, of San Francisco, California, pursuant to which it will cooperate with us in the matter of financing and managing the work. The contract (NOd-1601) remains exclusively in our name, without limitation on our liability for its performance and all communications and dealings respecting the same should be addressed to and carried on exclusively with us. The enclosed copy of this agreement is furnished so that you may be fully advised concerning the same.
Defendant was, therefore, fully aware that, while the contract was signed by Willamette alone, it was signed by it on behalf of the joint venturers.
Under plaintiff’s contract with defendant it was entitled to its costs in performing the contract, which, as stated above, included the excise tax necessary to be paid in order to perform the contract. Defendant has reimbursed Willamette for the excise tax paid by it, but, since defendant was fully aware that Willamette was signing the contract not only on its own behalf, but also on behalf of Atkinson, its coadven-turer, and since Atkinson actively participated in carrying out the contract, defendant is also liable for the excise tax which Atkinson had to pay in order to do its part in the performance of the contract.
Had Willamette been entitled to all the profits from the venture, its taxes to the State of Oregon would, presumably, have been increased by the amount of the taxes paid by Atkinson, since the tax was measured by the net income.
Defendant makes the claim that the administrative decision denying plaintiff’s claim for Atkinson’s excise taxes is final, but it is thought that this claim is not seriously made. The question of defendant’s liability to reimburse plaintiff is not a question of fact, but one of law, as to which the administrative decision is not conclusive on this court.
Plaintiff is entitled to recover of defendant the sum of $52,832.95. Judgment for this amount will be entered.
LaeamoRB, Judge,; MaddeN, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
*29 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. At times material to this action, Willamette Iron and Steel Corporation (hereafter Willamette) was an Oregon corporation. On December 31, 1951, Willamette was dissolved and H. A. Hamlin was appointed as Trustee, charged with responsibility of completing the liquidation and winding up of the corporate affairs.
2. In the fall of 1940, Willamette entered into negotiations with the Navy Department for the construction and delivery of certain proposed mine sweepers.
3. On December 16, 1940, Willamette was duly notified that it had been awarded a cost-plus-a-fixed-fee contract for the construction of two mine layers, subject to the requirement of posting a performance bond of $1,000,000 and a payment bond in the statutory penal sum of $2,500,000.
4. a. Willamette had been unable to secure bonds in the amounts aforementioned and, in order to accept and complete the contract, it entered into a joint venture agreement with the Guy F. Atkinson Company (hereafter Atkinson), a Nevada corporation, on December 28, 1940, which agreement provided, in part, as follows:
Whereas Willamette anticipates entering into a contract with the United States of America for the construction of two mine layers * * *; and
Whereas said contract requires Willamette to obtain and deliver to the United States of America a payment and performance bond; and
Whereas it is anticipated that the surety will require the creation of a trust fund of approximately one million two hundred thousand dollars ($1,200,000) * * *; and
Whereas the parties desire to enter into an agreement under the laws of Oregon for the purpose of carrying out said contract as a joint venture, * * *
Now, thereboRE, this agreement witNesseth: * * *
1. The carrying out of said contract with the United States of America shall be the joint venture of the parties, * * *.
*30 2. Upon the signing of this agreement, Atkinson agrees to contribute the sum of six hundred thousand dollars ($600,000) to the trust fund of one million two hundred thousand dollars ($1,200,000) to be created for the purpose of carrying out said contract. Atkinson shall be under no obligation to provide any other capital contribution or any other property, plant equipment or facilities to the joint venture.
Notwithstanding the fact that said contract is to be Eerformed as a joint venture, the contract and any ond required thereunder shall be signed only by Willamette.
$ &
3. Willamette also agrees to contribute to said trust fund the remaining six hundred thousand dollars ($600,000) and to make available for the carrying out of said contract all of Willamette’s existing plant equipment, facilities and other property, including any facilities which may be acquired or built under any plant facilities contract with the United States Government, which may be necessary or desirable for use in connection with the joint venture.
*****
All receipts and expenditures of Willamette relating to the joint venture shall be kept separate from all other receipts and disbursements of Willamette.
It is understood that by reason of the fact that Willamette will also engage in work other than the work under said contract, it will be necessary to prorate certain charges, costs and expense between Willamette’s separate work and the work under said contract, and that Article XI of said contract likewise recognizes this fact and provides for such proration substantially in accordance with T. D. 5000.
It is therefore agreed that in determining costs for which Willamette is to receive payment from the joint venture, any proration which is approved by the United States under said contract.will be binding on Atkinson.
The receipts in connection with the performance of said contract shall be deposited in a joint venture trust fund and shall first be used to pay for expenditures under said contract, which shall specifically include all payments or disbursements approved by the United States as proper charges against the United States under said contract. There shall also be charged to the joint venture and paid from the trust fund other expenses and disbursements of each of the parties or of the joint *31 venture itself which, under approved accounting practice, are chargeable to the joint enterprise.
Willamette shall then receive a credit of thirty (30) percent of the profits from the joint venture as so determined, which thirty (30) percent is deemed to be for the use of Willamette’s general fabilities as a going concern, that is to say, facilities which have not been already directly charged to the joint venture.
The net profit determined after the charges, credits, payments, and applications above provided for shall then be divided equally between Willamette and Atkinson and distributed from time to time when, as and if available. Capital contributions of each of the parties shall likewise be returned and distributed equally when this may be done without prejudice to the further carrying out of the joint venture.
* * * * «
Any property hereafter acquired by Willamette at the expense of the joint venture account shall become the property of the joint venture.
* * * * *
6. All joint venture funds shall be deposited in a bank or banks mutually agreed upon and such funds shall be withdrawn only as agreed upon by the parties.
7. Books of account, in accordance with good accounting practice, shall be maintained by the joint venture in the manner usual in like businesses, and both parties shall cause to be entered in such books a full and accurate account of all transactions on behalf of the joint venture. Said books of account and all joint venture records shall be kept at the joint venture office to be located adjacent to the work to be performed on the premises of Willamette at Portland, Oregon, and each of the parties may at all times have access to and inspect and copy any of them. After the beginning of each calendar year a detailed audited statement shall be prepared by a certified public accountant showing the operations of the joint venture for the preceding year and a statement as of the close of business on December 31st of the preceding year.
8. This contract contemplates that Atkinson will have nothing to do with the activities of Willamette outside of the said contract comprising the joint venture, and the work comprising the joint venture is to be kept apart and as distinct and separate as possible from other business of Willamette.
*32 It is specifically understood and agreed that ship conversion and ship repair work shall not be included in the joint venture and that this and other work may continue to be carried on by Willamette in its individual corporate capacity.
*****
10. Atkinson is also to have the right to nominate a person to be employed by the joint venture who is to devote his full time in an executive managerial capacity to cooperate in supervising the work comprising the joint venture. * * *
b. Under the same date, December 28, 1940, the parties also agreed in writing that Atkinson would have the right to participate with Willamette on a joint venture basis identical to the original agreement in any additional ship construction work undertaken by Willamette for the ensuing five years.
o. In brief, while Akinson was initially approached by Willamette because of the latter’s inability to obtain a qualified bond, under the joint venture agreement Atkinson was brought in and, as later developed, managed the work under the joint venture.
5. a. On January 2, 1941, the contracting officer was informally advised by plaintiff of the joint venture. On January 6th, representatives of Atkinson and Willamette met all day with the contracting officer discussing plans for the joint venture to perform the contract, and the latter expressed his satisfaction with the arrangement. Under date of January 7, contract NOd-1601 was executed by and between defendant and Willamette and on the same day Willamette wrote defendant as follows:
We have executed and hand you herewith contract NOd-1601 in triplicate, relating to the construction of mine, layers CM6/7, together with the surety bonds in triplicate, which we are required to furnish to assure faithful performance of the contract and payment of labor and materials.
*****
We also hand you herewith a copy of a joint venture agreement which we have made under date ^December 28, 1940, with the Guy F. Atkinson Company of San Francisco, California, pursuant to which it will cooperate *33 with us in the matter of financing and managing the work. The contract (NOd-1601) remains exclusively in our name, without limitation on our liability for its performance and all communications and dealings respecting the same should be addressed to and carried on exclusively with us. The enclosed copy of this agreement is furnished so that you may be fully advised concerning the same.
b. The executed contract NOd-1601, which contained no reference to the joint venture agreement or to Atkinson, was signed by Willamette’s vice-president and bore Willamette’s corporate seal. The accompanying performance and payment bonds were executed by Willamette as “Principal” and made no reference to Atkinson, although the surety knew of the joint venture arrangement prior to execution of the bond.
6. a. On January 15, 1942, prior to execution of another contract NObs-341 for mine sweepers and with reference thereto, Atkinson requested Willamette to secure defendant’s permission to formally include Atkinson as a party to the contract, or in lieu to fully advise defendant of the applicability of the joint venture agreement so as to protect Atkinson’s interests. It was Atkinson’s later understanding that defendant desired the contract to be in the name of Willamette alone, and on January 21, 1942, Willamette and Atkinson agreed in writing that the joint venture agreement would be extended to contract NObs-341.
b. On January 24,1942, Willamette wrote defendant, with reference to contract NObs-341, as follows:
We also hand you herewith a copy of a letter extending the joint venture agreement between our company and Guy F. Atkinson Company of San Francisco, California, to include the proposed contract for these mine sweepers. A copy of the original agreement is on file with the Department, having been furnished you in connection with our former contract No. NOD-1601. We understand that the Department prefers that the contract for the mine sweepers remain exclusively in the name of Willamette Iron and Steel Corporation without limitation on our liability for its performance, and that all communications and dealings respecting the same should be addressed to and carried on exclusively with Willamette Iron and Steel Corporation.
*34 We wish the record to show some acknowledgment from the Department of this notice that the new contract will be carried on under the joint venture agreement, although the contract will actually be signed only by the Willamette Iron and Steel Corporation.
The evidence does not contain a formal acknowledgment by the Navy of plaintiff’s foregoing request for an acknowledgment that the new contract would be carried on under the joint venture agreement. However, the contract was performed under the joint venture agreement with the full knowledge, tacit acquiescence and cooperation of the Navy.
7. Thereafter Willamette and defendant entered into the following contracts bearing the dates indicated:

All of said contracts were executed by Willamette. None contained any reference to Atkinson or to the joint venture, nor any patent inference that Willamette was signing on behalf of any other party or on behalf of the joint venture.
8. Although the joint venture agreement, referred to in Finding 4, related only to work under contract No. NOd-1601, later joint venture agreements of similar nature were executed by and between Willamette and Atkinson, by the terms of which both jointly participated in the financing and management of the subsequent contracts. However, in the subsequent joint venture agreements, Willamette received 65% of the net profit and Atkinson 35%. While the evidence does not establish that the Navy was formally advised of the subsequent joint venture agreements, it knew or should have known that all the contracts were performed by the joint venture, since Navy representatives were present throughout the period of performance, were kept constantly advised by plaintiff and/or representatives of the joint venture, and audited the joint venture’s books and records.
*35 9. a. All of the contracts were performed by the joint venture through plant and facilities constructed and operated by the joint venture pursuant to a defense plant contract. Contract performance was actually managed by Atkinson’s representatives. Neither Willamette nor Atkinson had any previous experience in shipbuilding.
b. At the outset of the contracts the joint venture went under the name of Willamette Iron and Steel Corporation (Shipbuilding Division) to keep it separate from the other activities of the Willamette Iron and Steel Corporation, but during the course of the work the words “(Shipbuilding Division)” were dropped from the name of the joint venture at the instance of the Navy.
c. Throughout the period of contract performance the operations of the joint venture were kept entirely separate and distinct from Willamette’s other activities. Thus there were separately installed and maintained offices, accounting systems and records, payrolls, bank accounts and checks. All of the personnel engaged in the performance of the contracts, whether furnished by Willamette or Atkinson, were carried on the separate payroll of the joint venture but under the name of Willamette Iron and Steel Corporation.
d. Willamette registered in the name of Willamette Iron and Steel Corporation with the Secretary of State as a manufacturer of vessels of war, as required by law, without mention of the existence of the joint venture. Atkinson did not so register. However, Willamette’s registration listed the names of its principal officers, among whom were persons who were officers and employees of Atkinson and the joint venture, although their identity as such was not disclosed by the registration. The registration also listed Atkinson as the principal stockholder of Willamette.
10. a. Contract NOd-1601 provided:
19. This contract shall not, nor shall any interest therein, be transferred by the contractor to any other person or persons, except that payments due the contractor hereunder may be assigned to any bank, trust company, or other financing institution including any Federal lending agency or to any bank, trust company, or other financing institution as trustee for any party or parties participating in the financing of this contract or as surety or sureties for the contractor herein.
*36 b. Tbe other nine contracts contained provisions in substance prohibiting assignments other than assignments to financing institutions in accordance with the Assignment of Claims Act of 1940.
11. a. Contract NObs-341 provided:
Art. 23. Disputes and claims. — Except as otherwise specifically provided in the contract, if any doubts or disputes arise concerning any question under the contract or as to anything in the plans or specifications, or if any discrepancy appears between said plans or specifications and the contract, the matter shall be referred at once to the Chief of the Bureau of Ships for determination; and his decision in the premises (made after a hearing, if desired by the Contractor) shall be conclusive and binding upon the parties hereto, subject, however, to review by the Secretary of the Navy at the Contractor’s request made in writing within 30 days after rendition of such decision. No claim arising under the contract will be considered unless submitted in writing to the Chief of the Bureau of Ships within six (6) months from the date of final acceptance of the vessel with request to which the claim arose.
b. As amended April 21,1942, paragraph 22 of the General Provisions of Contract NOd-1601 provided:
22. (a) Appeals by the Contractor from decisions of the Bureau of Supplies and Accounts in respect of the determination of costs, final settlement under the contract, or any other matter affecting payments by or to the Contractor, shall be referred in the first instance to the Compensation Board. All other doubts and disputes arising under the contract or the plans and specifications, or by reason of discrepancies between the contract and the plans and specifications, shall be referred promptly to the Chief of the Bureau of Ships for determination (after a hearing, if desired by the Contractor). The Contractor may obtain review by the Secretary of the Navy of the determinations of the Compensation Board and the Chief of the Bureau of Ships upon written request made within 30 days after the date thereof. Any determination of the Secretary of the Navy, or of the Chief of the Bureau of Ships or the Compensation Board if review is not requested, made pursuant to the provisions of this paragraph, shall be conclusive as to all matters of fact involved therein.
*37 (b) No claim in respect of the contract will be considered unless submitted in writing to the Chief of the Bureau of Ships within 6 months from the date of final acceptance of the vessel with which the claim is concerned.
o. All other contracts provided that the decision of the Secretary of the Navy would be final only as to questions of fact.
12. a. Article 11 (a) of contract NOd-1601 provided for the payment, in addition to the fixed fee, of “the true cost, as determined by the Compensation Board,” and further provided in Article 11 (e) :
For the purpose of determining the amount payable under this contract, costs will be determined by the Compensation Board substantially in accordance with the procedure for determining costs as set forth in the Regulations promulgated by the Treasury Department and approved by the Secretary of the Navy August 6, 1940 (T. D. 5000).
b. Article 12 (a) of contract NOd-1601 provided that payments were to be made upon “certified bills to cover costs, as determined by the Compensation Board, incurred by the contractor.” By amendment of April 21,1942, the term “Bureau of Supplies and Accounts” was substituted for the term “Compensation Board” throughout the contract.
13. a. Article 9 (a) of contract NObs-341 provided for the payment of a fixed fee and of “the true cost, as determined by the Compensation Board.” Article 9 (e) provided that:
For the purpose of determining the amount payable under the contract, costs will be determined by the Bureau of Supplies and Accounts in accordance with the procedure in Treasury Department Regulations T. D. 5000 insofar as applicable, and, insofar as not applicable, in accordance with sound accounting practice.
b. Article 10 (a) of contract NObs-341 provided for payments of “such amounts as are determined by the Bureau of Supplies and Accounts to be true costs incurred by the Contractor * *
c. The remaining eight contracts provided in Article 9, with minor variations in language, that:
*38 (a) The Department will pay * * * the allowable cost, as defined in paragraph (b) [“c” in contract NObs-1173] of this Article, plus afixed fee * * *.
(b) Allowable cost shall constitute the cost incurred by the Contractor in the performance of the contract [“after 30 September 1943” in NObs-1173] and accepted by the Bureau of Supplies and Accounts of the Department as chargeable in accordance with “Explanation of Principles for Determination of Costs Under Government Contracts * * *” [with exceptions not here relevant] .
14. Section 26.9 of Treasury Decision 5000 provided:
(a) General Rule. — The cost of performing a particular contract or subcontract shall be the sum of (1) the direct costs, including therein expenditures for materials, direct labor and direct expenses, incurred by the contracting party in performing the contract or subcontract; and (2) the proper proportion of any indirect costs (including therein a reasonable proportion of management expenses) incident to and necessary for the performance of the contract or subcontract.
* * * * *
(g) (4) * * * Among the items which shall not be included as a part of the cost of performing a contract or subcontract or considered in determining such cost, are * * * Federal and State income and excess-profits taxes and surtaxes; * *
15. a. The Explanation of Principles for Determination of Costs under Government Contracts provided:
4. The total cost under a contract is the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto. * * *
b. Paragraph 40 of the same, covering administrative and general corporate expenses incurred in the contractor’s business expressly included as reimbursable items of cost “State and local taxes (other than income taxes) not elsewhere included.”
16. Willamette received reimbursement from the joint venture for direct expenses it had incurred. The evidence does not satisfactorily establish whether or to what extent Atkinson was reimbursed by the joint venture for direct ex *39 penses. As to indirect expenses, including the operation of its overhead allocable to the Navy contracts, Willamette •was reimbursed by the joint venture but Atkinson was neither reimbursed nor did it bill the joint venture for these expenses, except for the claim presented in this action.
17. a. Under the laws of the State of Oregon “every mercantile, manufacturing and business corporation doing or authorized to do business within this State shall annually pay to the State * * * for the privilege of carrying on or doing of business by it within this State, an excise tax according to or measured by its net income * * *.” (Oregon Compiled Laws, Ann., Sec. 110-1506.) During the period here involved the excise tax, under the statute, was to be computed at the rate of 8% upon the basis of a corporation’s net income for each year prior to and including 1943, and at the rate of 5% upon the basis of its net income for the year 1944 and for each year thereafter; each corporation being entitled to an offset against the tax in the amount of taxes assessed to and paid by the corporation upon its personal property located in the State, the offset, however, not to exceed 50% of the excise tax.
5. Willamette and Atkinson paid said taxes individually, based upon net income derived by each from the profits of the joint venture. The following table indicates the taxes paid by Atkinson by reason of profits earned by it under the named contracts:

Contract 19Í1-Ü 19^5

NOd-1601 _$15, 383. 89 $869.11
NObS-341_ 7,602.12 51.68
NObs-612_ 8,059.18 38.58
NObs-762 _ 5,686.14 1,094.71
NObs-1173_ 1,298.84 1,259.31
NObs-1354 _ 2,686.30 140.93
NObs-1591_ 294.98 4.69
NObs-1835 _ 496.14 933.12
NObs-1854 _ 671.37 5,997.64
NObS-2115_ _ 264.22
Total_ 42,178.96 10,653.99
18. At all times prior to 1945, the Navy ruled that such a tax (i. e., The Oregon Excise Tax) was in the nature of an income tax, and not a reimbursable item, and all contracts ex *40 cept NObs-2115 were executed by Willamette in tbe belief that tbe tax was not recoverable. Neither Willamette nor Atkinson made any attempt to recoup tbe tax paid for tbe years 1941-44, acquiescing in the Navy’s position. On January 12,1945, the Navy changed its ruling, and notified Willamette that tbe tax would be regarded as a reimbursable item. Willamette thereupon filed a claim for such excise taxes it bad paid and was reimbursed therefor.
19. a. On July 27,1945, plaintiff requested a ruling as to the reimbursability of the Oregon excise tax paid by Atkinson. On August 20, 1945, plaintiff was notified that the item was not regarded as reimbursable, and, on January 2, 1946, plaintiff received a formal notice of disallowance. Its tax claim then amounted to $42,178.96. On February 20, 1946, plaintiff appealed to the Bureau of Supplies and Accounts from the decision of the Cost Inspector. On August 22,1946, the Bureau of Supplies and Accounts forwarded its ruling denying the claim, in which it found:
a. All of the subject contracts are between the Navy Department and the Willamette Iron & Steel Company — the Guy F. Atkinson Company is not a party to such contracts.
b. The tax in question is legally a liability of the Guy F. Atkinson Company for the privilege of doing business.
c. There is no provision in the contracts nor in the cost determination principles specified therein (that is, TD 5000 and the Explanation of Principles For Determination of Costs Under Government Contracts) under which the Navy Department is obligated to pay taxes for the privilege of doing business of a company which is neither a party to the contract nor performing part of the contract work under an approved cost type subcontract.
b. On September 17,1946, plaintiff appealed from the f ore-going decision to the Secretary of the Navy.
c. On November 4,1946, plaintiff received notice of disal-lowance of similar taxes in the amount of $10,658.99, covering Oregon excise taxes paid by Atkinson for the year 1945, from which plaintiff appealed on December 3,1946. At the request of Willamette the claims for $42,178.96 and $10,653.99 were considered jointly by the Board of Contract Appeals *41 and tbe claims were denied by an opinion dated March 24, 1949, concurred in by the Secretary of the Navy on March 26, 1949.
20. The Board of Contract Appeals in denying plaintiff’s claim found:
* * * On all the evidence the Board is of the opinion that the contracts were executed by Appellant [Willamette] in its individual corporate capacity, and that Guy F. Atkinson Company did not become a party to the contracts, either as a disclosed or undisclosed principal.
21. Willamette reimbursed Atkinson for the excise tax paid by said company, but in 1948 charged this payment against the investment account of Atkinson, thereby nullifying its previous reimbursement. The recovery in this case by plaintiff will be paid by it to Atkinson.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is adjudged and ordered that it recover of and from the United States the sum of fifty-two thousand eight hundred thirty-two dollars and ninety-five cents ($52,832.95).